INHABITANTS OF THE TOWN OF WINTHROP
*vs.*
LAWRENCE H. FOSTER, HIS ASSOCIATES,
HEIRS AND ASSIGNS

Kennebec.   Opinion, January 23, 1961.

*Howard H. Slosberg,*
*Sanborn & Sanborn,* for plaintiff.

*Alton Lessard,*
*Herbert E. Foster,* for defendants.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN,
SIDDALL, JJ. DUBORD, J., did not sit.

RESCRIPT.

SULLIVAN, J.    This is equity process instituted in September, 1959 by the Town of Winthrop and its selectmen against the defendant to acquire a mandatory injunction.

The Legislature had enacted a private and special law, effective September 12, A. D. 1959, authorizing the defendant to construct, maintain and control at a delimited location a

wharf in the waters of Lake Maranacook at and adjacent to Bowdoin Street in Winthrop. The wharf had been restricted to an extension of 18 feet into the lake from the low water mark and was not to be built upon town land until the defendant had first obtained from the town voters their approval granted at a town meeting. P. & S., 1959, c. 150. No such vote has ever been sought or had by the defendant.

Although warned in writing by the Selectmen to desist the defendant subsequent to September 12, 1959 built his wharf within prescribed dimension and area from a position under the bank at Bowdoin Street and projecting into the lake.

The wrought and traveled portion of Bowdoin Street at the emplacement of the wharf skirts the edge of the lake leaving on the lakeside a narrow shoulder buttressed by a stone wall against erosion from water and storms. Bowdoin Street is a public way laid out originally in 1797 and successfully realigned in 1873 and in 1902.

The lake is concededly a "great pond" of more than 10 acres. (118 Me. @ 503). The Town asserts that it owns the fee in the land and in the lake bottom where the defendant's wharf is positioned or that it has at least an easement or right of way thereon. The Town contends that since 1873 as Bowdoin Street has become demarcated the public right of way extends into the area of the lake some 33 feet from present high water mark which is the stone wall supporting the street shoulder at the shore. The Town insists that whether it is the proprietor in fee by eventualities with the passage of time or only the owner of a public easement, nevertheless the location of the defendant's wharf is "town land" within the intendment of the private legislative act and that the defendant had no authority to construct his wharf at its situs without the sanction of a town vote.

24

"The following rules shall be observed in the construction of statutes, unless such construction is inconsistent with the plain meaning of the enactment.

X. The word 'land' or 'lands' and the words 'real estate' include lands and all tenements and hereditaments connected therewith, and all rights thereto and interests therein."

R. S., c. 10, § 22.

The Town requests the imposition of a mandatory injunction obligating the defendant to remove his wharf from its assumed position.

The defendant admits his acts and doings which he justifies by the authority of his legislative prerogative.

A hearing has been had and the presiding justice has formally found and decreed as follows:

"There is no clear allegation in the bill that the Town of Winthrop is a littoral land owner and that its rights as such have been impeded, impaired or encroached upon by any act of the defendant pursuant to presumed Legislative authority. I, therefore, make no finding as to whether or not the town is a littoral land owner.

This leaves only one issue to be resolved, and that is, whether or not the wharf is built on town land.

It is my opinion, and I so find as a fact, that the evidence does not support a finding that the wharf is built on town land.

It is, therefore, Ordered, Adjudged and Decreed, that the plaintiff's bill be dismissed without costs."

The plaintiff's appeal.

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to

the opportunity of the trial court to judge of the credibility of the witnesses."

Rule 52, M. R. C. P.

The presiding justice has concluded that the plaintiffs were unsuccessful in demonstrating that the Town of Winthrop was either owner in fee or holder of an easement in the land or lake bottom beneath the defendant's wharf. In becoming deference to R. S., c. 10, § 22, *supra*, we must deduce that the justice by finding that defendant's wharf is not upon town land incidentally and necessarily had determined that the evidence had been deficient to substantiate the containment by the public right of way of any ground lakeward from the banking.

We have reviewed and examined the testimony and exhibits to test the compatibility of the judicial findings with the evidence and with legal principle. Much probative detail and rationalization incidental to the fixation of bounds and *termini* as they exist on the face of the earth are wanting. No data are afforded for ascertaining the natural low water mark of the lake as it subsisted in past years when Bowdoin Street was defined. For 50 years a presumptive mill privilege has controlled the level of the lake water but by what authority does not appear. Commenting upon the spot where defendant's wharf lies a witness said:

"Q. The situation there today is not any different than it was fifty years ago?
"A. No, sir.

"The Court: Is there any difference in the water level?
"A. Yes, there is.

"(Defense Counsel): What is the difference?

"A. Of course the mill, when the mill was running they used this lake for power entirely. In the last period of years ten or twelve years, they don't use the water for the water wheels any more. They

use the water for washing purposes but the water don't get down so low as it used to.

"Q. The low water mark has changed?

"A. It isn't as low as it used to be.

"Q. You know something about Foster's new wharf?

"A. Yes. When this was torn down I used some of the lumber to keep mine from tumbling down.

"Q. Are his posts below low water mark?

"A. That would vary. We had high water all summer; the mill don't draw it down much now.

"Q. It would be your statement then his posts have been driven in the ground well beyond the average low-water mark?

"A. I would say, yes, the average. There used to be the electric line along in here (indicating). I own property back here."

Some 40 years ago one Harry Stanley owned a wharf where the defendant's now stands. Stanley's wharf eventually rotted and disintegrated. Six years ago the defendant built a wharf replacing Stanley's and in 1959 substituted the wharf now in controversy for his former one. A privately owned wharf adjacent to the defendant's is only the latest in a succession of wharves to occupy its station through a span of 50 years.

The water height remains fairly uniform save for September and October when it is lower for one month to six weeks and for the spring flood when the water is higher. The water extends completely under the defendant's wharf except for the fall ebb when one-half of the wharf rests upon uninundated ground.

Years ago, how many we are not told, an electric, street railway, now presumedly extinct, had its steel tracks in or adjacent to Bowdoin Street which was then a dirt road and such tracks lay on the lake side or lakeward of the street.

The record is silent as to whether or not the street railway at or by the locus of defendant's wharf enjoyed a land fee or easement or license and the state of the title to the road-bed is not revealed for the time subsequent to dissolution of the railway.

An engineer-surveyor testified and supplied plans. The gist of his testimony was that he had made research in the town records, had ascertained metes, bounds and description and had with such and with additional resources reproduced the officially constituted limits of Green and Bowdoin Streets in the area in controversy as those limits were laid out by the selectmen in 1873 and in 1902. Unfortunately some of the important testimony was neutralized by the witness' fingered references to his plans without any accompanying explanation in the record of what he was specifying. He concluded that Bowdoin Street originally 66 feet in width now extends 33 feet into the lake from the edge of the existing road and includes the terrain where the defendant's wharf is located. When asked if there has been any changes in the road since it had been laid, he answered: "I do not find any." In the 1902 laying out of Bowdoin Street an important monument had been "the northwesterly corner of the underpinning of the main house of Mrs. Christina E. McEdwards." The witness in cross examination acknowledged that the house is no longer there and that he had to "establish it working back to the development from Green Street."

The following are excerpts from the record of the engineer's testimony:

"Q. Would you tell us what you have done with reference to this plan in showing the location of Bowdoin Street?

"A. Yes. I checked the records of the town and find Bowdoin Street was drawn up in 1873, and at that time they gave a bearing with metes and bounds, a description of it. I also checked the land

between Bowdoin and Green Streets and *this is where Bowdoin Street came in my opinion* (indicating on plan). I also laid out Bowdoin Street on this, which took it out here in the water, *which gave me some concern.* At the time Bowdoin Street was laid out, this was dry land in here (indicating)." (Italics supplied.)

In response to court inquiry the witness said:

"Q. Do you have any knowledge that the low water mark was changed along that location?

"A. I don't know. Bowdoin Street I laid out from the description. It begins here (sic) and works right down through here (sic) to Maine Street. *There is reason to believe it came down this way.*" (Italics supplied.)

Continuing upon questioning by plaintiffs' counsel the witness added:

"Q. What was the year of the first lay out?

"A. 1797.

"Q. The first Bowdoin Street was laid out in 1797?

"A. It began here (sic) and went out here (sic), which I *assume was dry land in those days.* (Italics supplied.)

(Defense Counsel) "Q. Just a moment, That is only an assumption on your part.

"A. No.

"Q. You don't know of your own knowledge?

"A. It is not an assumption.

"Q. You are assuming it was dry.

"A. That part, I am assuming it was dry.

"Q. You couldn't establish a line from the description anywhere.

"A. *The only one I could establish was the subsequent purchase of the town of some additional land on the east side.* (Italics supplied.)

"Q. Thence west to a stake.

"A. It has all been dug up.

"Q. You couldn't establish anything from that. It had to be on something further.

"A. The town owns five rods, not four rods.

- - - - - - - - - - - -

"The Court: I have a question. I have in my hand Plaintiff's Exhibit No. 3 (photo). Is that the wharf in question?

"A. Yes.

"Q. Who owns the property across the road at that point?

"A. I don't know who owns it. Until recently, Frank Tuttle owned it.

"Q. Do you know where the line of that land is? Can you find the line?

"A. In his description it begins two hundred fifty-one feet from a point fifteen feet in back of a barn. Going back to this one, to the barn in question, going back fifteen feet from there, it takes us 251 feet to this point right here. (sic)

"Q. Where does five rods take you measuring north?

"A. Out here (sic).

"Q. That was extended in 1902.

"A. In 1902 it was widened.

"Q. I am talking about how the land lies on the face of the earth today, this line which was the Tuttle line —

"A. It is Childs now.

"Q. Measuring north eighty feet or five rods, this brings you out in the lake.

"A. Yes.

"Q. Do you think that is realistic?

"A. Yes, when you bear in mind we have surveyed all this (sic) and this (sic) is shallow water. It isn't deep water."

The engineer-surveyor did not recite and was not interrogated concerning the precise particulars of his research and his restoration of Bowdoin or Green Street as laid out. Pins, lines, property bounds, surviving monuments utilized to localize obliterated monuments, etc. are not enumerated in detail by him. Some of his testimony is more conclusive than didactic. Some of it upon review fails of purpose from lack of understandable references to exhibits. One plan introduced contains courses, distances, angles and the family names of one grantor and grantee but not specific allocation to the face of the earth.

Other testimony and exhibits depict Bowdoin Street very graphically at defendant's wharf location as an established and well wrought public way with a considerable shoulder and a sturdy stone wall of some long and weathered duration supporting that shoulder. Water laps that stone wall during all but a month or a month and a half of each year. There is a visual history of water having covered the lake bottom for some fifty years save for an annual period of six to eight weeks when a fringe has been bared. A mill has continuously asserted a control flooding the lake shore for fifty years. Wharves have stood at and near the defendant's assumed position during forty or fifty years. The street railway formerly operated between traveled Bowdoin Street and the lake.

The plaintiffs were laden with the burden of proving that the Town held an easement in or around the lake beneath the defendant's wharf. The presiding justice enjoyed the advantage of viewing the witnesses. He found that the Town had not sustained its onus. The record does not sustain the position that the justice in his negative conclusion was clearly erroneous.

*Appeal denied.*